Okay, Mr. Murray, as soon as everybody gets settled. Good morning. It pleases the Court. My name is Chris Murray. I'm here on behalf of the petitioner, Katch Kan. As the Court knows, this case is about whether Katch Kan terminated the employment of Tanner Seams on August 8, 2014, because it was motivated by a retaliatory animus resulting from his participation in a work stoppage 11 days earlier on July 28. And the standard of review is only substantial evidence, is that right? That's correct, Your Honor. Pretty steep standard for you. It is, Your Honor. In the case, the issue that this case presents for this Court on appeal is whether the ALJ, in finding that Katch Kan had been motivated by a discriminatory animus, based that decision on evidence, and whether it was a reasonable inference from circumstantial evidence, or whether it was a speculative leap without support from the evidence. In this case, the ALJ did cross the line from inference to speculation. And you criticize the ALJ's reliance on the fact that Ramsey said he couldn't remember that particular comment about don't mean shit. Isn't that the type of thing that fact finders, juries, judges, whoever is sitting as the fact finder, makes every day when they say, oh boy, that really seemed important. The fact he doesn't remember that must mean he's not being truthful here. What's improper about that? Certainly, Your Honor. First of all, in the context, that decision itself by the ALJ was based on speculation. The evidence in support of his finding was extremely weak. It was based solely on testimony from two or three hostile witnesses that his face turned red when Mr. Seams said that to him. That's extreme. There's no admission from Mr. Ramsey that he was angry. There's no evidence in the record that he ever engaged in any conduct after that event that suggested that he harbored some anger or resentment about that. That finding itself by the ALJ was essentially speculation that he must have been angry because these witnesses testified his face turned red. Because he said he couldn't remember it, which the ALJ said, well, I read that to mean he didn't want to remember it because he might have been mad about it. Yes, Your Honor. As we point out in our briefs, Mr. Ramsey's testimony on that point was highly plausible in the circumstances. Under the circumstances, this was a one-day work stoppage. And I think it's important to point that out, that this was not an ongoing, long-term conflict between the employees and Mr. Ramsey. It was a one-day event on July 12th. But it was occasioned by a major change in the terms of their employment. It may have been a one-day stoppage, but it was a major precipitating event. It was major. It was a major proposed change. And it was resolved fairly quickly, Your Honor. The employees actually got fairly quickly much of what they demanded in response to that proposed change. And there's no evidence in the record that Mr. Ramsey had any special investment in that change in the terms of their employment. It was a directive that came down from those above him. He delivered the message, but there's no suggestion that he had a personal investment in that change. And as I mentioned, the employees actually responded fairly quickly that morning that they would not continue to work unless at least they got their seven-day on, seven-day off schedule back, which was given to them fairly quickly. So, as I suggested here, the question here for this Court, especially given the standard of review, is whether the ALJ, in making the final decision that the termination on August 8th has some causal relation to the activity on July 28th, whether that was mere speculation. The Board, in its brief on pages 18 and 19, suggested there were at least six different ways that it could provide circumstantial evidence that would support this inference. However, none of those six means of circumstantially showing some retaliatory animus supports the ALJ's decision. First, the Board noted the evidence that the employer had knowledge of the protected activity and hostility towards it could support a finding. But that is merely a necessary condition for finding causation. It's not sufficient in itself. Second, the Board notes that timing of the discipline following, obviously, the protected activity could support an inference. But here, as I pointed out, the timing, although it's only 11 days, in the circumstances was actually a long time because there was, as I mentioned earlier, no evidence that this was a long, ongoing, simmering conflict between employees and Mr. Ramsey. Third, the Board suggests that evidence of disparate treatment or discipline that deviates from the employer's past practices could be circumstantial evidence supporting causation finding or showing a retaliatory animus. Here, there's absolutely no evidence in the record there was any type of similarly situated employee to Mr. Seams who had engaged in similar conduct in the past and been treated differently. There's simply no evidence that any employee had ever been in that same situation before, prior to that point. In fact, the ALJ did find that there was one employee who was somewhat similarly situated afterward on page 301 of the record of the ALJ's decision. The ALJ notes that employee John Canales was asked to go to Kenya in December of 2014, and he refused on the eve of the assignment, and he was terminated. His employment was terminated. What's significant about that is that Mr. Canales was a supervisory employee. He participated on July 28th in the work stoppage issue on behalf of Catch Can. So there's no suggestion that he could even be covered by the NLRA. Now, there were some other circumstances related to his employment, and I just want to point that out, that there was the issue about whether or not he would be able to continue working in the United States because he had lost his driver's license. But he's the only employee in the entire record who's even close to similarly situated to Mr. Seames, and it shows that he was treated in the same way when he backed out of the Kenya assignment. Fourth, the board points out that if the employer relies on pretextual justifications, that can support an inference of retaliatory animus. This argument is somewhat circular to the extent that it assumes that the reasons given by Catch Can were pretextual. But here the ALJ relied heavily on what he called the lack of prejudice to Catch Can from Mr. Seames refusing to go to Saudi Arabia and taking the Saudi Arabian assignment. He pointed out that ultimately the employees who did go to Saudi Arabia didn't go for several weeks to Canada for their training. They ultimately only sent one employee to Saudi Arabia the following year in February. But that's all with the benefit of hindsight. Certainly, afterward, you could say, well, Mr. Seames' refusal on August 8th to acknowledge that he was still on board with this assignment didn't cause any prejudice when we look back at it. But at the time, from the perspective of Catch Can, its perspective needs to be what is viewed as reasonable here. Catch Can, as we point out in the record, was on the verge of a potential large new relationship with Aramco, the largest oil producer in the world. It was totally subject to Aramco's schedule. It needed to have a team that was ready to go. It needed to know that it could rely on that team when Aramco finally gave the direction to go forward. From that perspective, Catch Can's and Mr. Ramsey's, in particular, conduct in holding the people he thought were on his team to their commitment to be ready to go is entirely reasonable and plausible, and it's certainly not pretextual on its face. Fifth, the board suggests that the implausibility of the employer's explanation for its actions can support an inference of retaliatory animus. This is largely the same analysis I just mentioned. There's certainly nothing implausible about Mr. Ramsey's conduct on August 8th when he held Mr. Reams to what he believed was his commitment to go to Saudi Arabia. Finally, the board points to inconsistency between the employer's proffered reasons for its action and other actions of that employer. Here, in fact, Mr. Ramsey's actions, as found by the ALJ himself, were consistent throughout both before and after the work stoppage with his belief that Mr. Seams had committed to go to Saudi Arabia. Mr. Seams testified himself that on July 16th, Mr. Ramsey first came to him and told him he had been selected for the assignment. That's over 12 days before the work stoppage. The record also shows that on July 17th, Mr. Ramsey sent an email to the HR department saying, this is my team, they're committed to go, and that listed Mr. Seams. It also gave the direction, we need to start hiring people to replace these folks, I anticipate losing them in two to three weeks. Again, that all happened before the work stoppage, and it's entirely consistent with Mr. Ramsey's belief that Mr. Seams was committed to this assignment. And the evidence also showed, and was found by the ALJ, that Kachkan did begin recruiting and hiring replacement workers for the people that it believed were going to Saudi Arabia. All of that is consistent with Mr. Ramsey's belief that Mr. Seams was committed to going. On the other hand, the ALJ focused almost entirely on Mr. Seams' testimony that his commitment to this had always been equivocal, that he was uncertain whether he was going. But even as recounted by the ALJ, Mr. Seams always said, yes, I'm going, but I want more information. Yes, I'm going, but I'd like more information about the scheduling. Yes, I'm going, but I'd like more information about the wages. In addition, his own conduct was consistent with his commitment. He did go get the passport. He never gave a definitive answer that he was not going to Saudi Arabia prior to July 28th. Now, at the end of the day, perhaps there was some miscommunication between Mr. Ramsey and Mr. Seams. Maybe they were talking past one another. Maybe Mr. Ramsey was attempting to strong-arm Mr. Seams into going on this trip to Saudi Arabia. But there's still no evidence, despite even their apparent miscommunications with one another, that on August 8th, Mr. Ramsey terminated Mr. Seams' employment for refusing to go to Saudi Arabia only as a pretext because of what he had done on July 28th. And in fact, it's also significant that Mr. Seams, on July 28th, was only one of about 10 or so employees who engaged in the work salvage. There's not evidence that Mr. Seams did anything to stand out as a leader. There's no evidence that he himself even refused a work assignment. The only person who's really identified as a leader of that work salvage is another employee named John Barrow. He's the one who everyone acknowledges refused to take work assignments that morning due  There's no evidence that any of the other employees who participated on July 28th suffered any sort of retaliation. In addition, all Mr. Seams needed to do to save his job on August 8th was to say, yes, I'll follow through on my commitment. If this was just an elaborate scheme on behalf of Mr. Ramsey to find some pretextual reason to get rid of Mr. Seams, it wouldn't make sense to put all of the power in Mr. Seams' hand to defeat that scheme. All he had to do was say yes. And now, with the benefit of hindsight from this perspective, Mr. Seams apparently wouldn't even have been required to go to Saudi Arabia, as the evidence shows, ultimately only one employee did in February of 2015. So all Mr. Seams needed to do was say yes. He could have saved his job and may not have even had to go to Saudi Arabia. So at the end of the day, the board and the ALJ does not offer any evidence that connects Mr. Seams' termination on August 8th with his conduct on July 28th. Any questions from the court? I will reserve the remainder of my time. All right. Thank you. You saved time for rebuttal, Mr. Murray. Mr. Elamont? May it please the Court, good morning, Your Honors. Michael Elamont on behalf of the board, seeking full enforcement of its order. I'd like to begin by correcting a factual point in the record. Opposing counsel stated that Mr. Seams clearly stated that yes, he was willing to go on the trip to Saudi Arabia prior to the work stoppage, but that he just wanted more information. That's simply not accurate. Repeatedly, Mr. Seams told Superintendent Ramsey and General Manager Nolan Todd that he was continuing to think about the trip and that he wanted more information before he agreed to go. That occurs on July 11th. July 21st, when he's first told he needs to get his passport, he again does not say yes, I'm agreeing to go. He says, I will get my passport in case I then agree to go later. Very similarly, on July 22nd, he has three conversations with Nolan Todd, and in each one he never specifically agrees to go, again, just states that he's getting his passport. And in fact, I would submit on July 22nd is really when he's firmly saying that he's not going to go. He tells Mr. Todd, I don't think it would be a good idea for me to go, and then leaves a message with Mr. Todd's secretary later that night saying he didn't think he was going to do it, meaning the trip. And then similarly, on July 28th, which is the day of the work stoppage, following the stoppage itself, Mr. Ramsey says to Mr. Seams, I want to send you on this trip to Saudi Arabia because I think it would help you out, given these new changes with the wage decrease, it would help you out to go on the trip. And again, Mr. Ramsey says, all right, but I'm still not sure that I want to go. And in fact, Mr. Ramsey is asked at trial, prior to when Mr. Seams backed out, had you ever indicated to him in any way that it was mandatory that he go on the trip to Saudi Arabia? And Mr. Ramsey's answer was, I don't believe I did. That's page 138 of the record. In regards more specifically to the passport, it again was something that Mr. Seams was very clear about when he was told to get the passport, was that this was not an indication that he was going on the trip or agreeing to go on the trip. And so for that reason, it really is sort of afterthought for Katchkan to say after they discharged Mr. Seams, that getting the passport was him agreeing to go. It was simply not a reasonable belief for Katchkan to believe that this was Mr. Seams putting himself out there and agreeing to go on the trip when he had repeatedly said he was not going to go or had still needed to think about going on the trip. It was mentioned also about opposing counsel about Mr. Barrows and if anyone was going to be retaliated against, why would it not be Mr. Barrows because he was also involved in this work stoppage and was a very vocal leader in the work stoppage. I would point to a few facts. As a preliminary matter, though, as this court recognized in Neighbors, the fact that an employer doesn't fire everyone who's engaged in protected concerted activity doesn't mean that it doesn't violate the act when it does fire one of the employees who engaged in a protected event. But more to the point, it's very clear from the record and from what the ALJ credited that Mr. Sims participated in this work stoppage in a unique way compared to the other employees. He's the one, as a subordinate, who curses at his supervisor in front of other subordinates during this stoppage and the ALJ credited the fact that he made that statement and credited the testimony of three witnesses, not just Mr. Sims but also Mr. Barrows and Mr. Wheeler, that this statement was made and that Mr. Ramsey was visibly angered after the statement was made to him. Furthermore, as to why Mr. Barrows might have not been fired, the fact of the matter is Mr. Barrows had already been told prior to the work stoppage that he wasn't going to Saudi Arabia, that he wasn't part of the team that was going, whereas Mr. Sims had been selected preliminarily subject to his agreement to go on the trip. And so it would have been all the more clear of Kajikan's animosity to the employees who engaged in the stoppage had they gone out of their way to fire Mr. Barrows. It's really just a matter of convenience for Mr. Ramsey that he can try and point to Mr. Sims engaging in this negotiation at the time of the work stoppage to go to Saudi Arabia and then use it as pretext for firing Mr. Sims. But again, as we point out in our brief, the credited evidence simply does not establish that Mr. Sims had ever agreed to go on the trip. Additionally, opposing counsel referenced the argument that Kajikan was behaving consistently with trying to please the client, Saudi Aramco, and we submit that is simply not the case. On October 4th, or I'm sorry, August 4th, is the date that Mr. Sims emails Kajikan and puts in no uncertain terms that he will not agree to go on the trip to Saudi Arabia. Kajikan then waits four days and does nothing. They don't reply to his email, they don't bring him into the office, they don't talk to him, they don't try to encourage him that he should go on the trip. They do nothing for four days until August 8th, which is the day that they give him the ultimatum to go. And then after August 8th, Ramsey is asked, well, how difficult was it for you to find a replacement for Mr. Sims to go on the trip after he backed out? And Ramsey says it wasn't difficult at all. He found somebody within a few days to take his place. And so this wasn't a business reason to fire Mr. Sims because Kajikan was going to be embarrassed in front of this new client. They were able to find a replacement and they were able to please the client and have somebody ready to go on August 11th to Canada for training, which was the next step in the process. And the last thing I will mention, if the Court has no further questions, is Kajikan also had work for Mr. Sims in Texas. That was testified to by Mr. Ramsey at page 149 of the record. They had a job for Mr. Sims in Texas. They didn't have to fire him. They could have left him at his current workstation. They had work for him to do. They were still busy at the time, was the testimony from Mr. Ramsey. And so the only reason we would submit that they would fire Mr. Sims is for pretextual reasons and even retaliation for him engaging in the work stoppage in the unique way that he did. And with that, if the Court has no questions, I would just reiterate my request for a cold court under the Board's order. Thank you, Mr. Ramsey. Thank you.  Thank you, Your Honor. The Board mentions the August 4th email from Mr. Sims to Ramsey stating that he no longer wants to go. And that is an important email. It doesn't include a statement from Mr. Sims that he's sorry, I can no longer go. That email is an admission that at least up to that point, Mr. Sims certainly understood why Kajikan would assume that he would have been committed. He essentially admits, I am now telling you I am no longer going, and I'm sorry for the inconvenience. Now, why didn't Mr. Ramsey act immediately on August 4th to find a replacement or to go to Mr. Sims and tell him this is an ultimatum, you've got to accept it or not? Well, there's not evidence in the record on that point. Mr. Ramsey, by the point, by the time the ALJ conducted the hearing in this case, had already been fired by Kajikan. He was not a friendly witness to Kajikan. If he had any desire to throw Kajikan under the bus, he easily could have done so. And there's not evidence in the record why didn't he act on August 4th to find a replacement. Maybe he didn't read the email. Maybe he was procrastinating. Again, that's just speculation. But what the record does show is that on August 8th, he was contacted by Nolan Todd and said, you need to have your people ready to go on Monday to Canada. And Mr. Ramsey called the people who he had identified as being on his team and told them they needed to be ready to go, and at that point, Mr. Sims directly told Mr. Ramsey I'm not going. And at that point, there were additional conversations, and ultimately by later that day, Mr. Ramsey told him you're going to be fired or you are fired for refusing to take this assignment. The board points out that there was work available for Mr. Sims in Texas. That point could be made with respect to any employee who's discharged for insubordination or refusing to follow an assignment. It doesn't show pretext. Certainly many employees who are terminated for not following the directions of their employer. So that alone doesn't show pretext. And Catch Can had an interest in holding people that it felt had committed to taking this international assignment to their commitments. I suppose probably from a similar perspective of general deterrence, Catch Can very plausibly could have wanted to communicate to others that it believed had agreed to take these potentially, from Catch Can's perspective, jeopardize a potentially lucrative operation for a large potential customer. The board argues that Mr. Sims participated in some unique way. Respectfully submit that the ALJ's own findings do not support that. The only thing distinctive about Mr. Sims' conduct was that he did apparently use profanity in asking for an agreement to be placed in writing when the employees' work terms were changed back. But even the ALJ constantly, throughout his fact-finding, uses the terms they, multiple. He uses plural to refer to the employees that morning. And throughout his description of what happened on the morning, or on the day of July 28th, Mr. Sims is not doing anything on that day to stand out as a leader of this organization of employees objecting to the change in their work terms. And finally, even if Mr. Ramsey was visibly agitated on the morning or the afternoon of July 28th when his word was challenged, even then, that requires a speculative leap as to why. Maybe he was agitated because he thought that they had resolved the issue. Maybe he was agitated because he was ready to go to lunch and he didn't want to have to go back and make yet another call that day. Even that requires speculation. And it's a far leap from a look on his face on July 28th, concluding that 12 days later, or 11 or 12 days later, he fired one out of a group of people because they had engaged in protected activity that morning. And unless the Court has any questions, the rest of our briefs. Thank you. Thank you, Mr. Murray. The case is under submission.